UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CARLOS PRICE,<br><br>          Defendant. | Criminal Action No. 22-4 (JMC) |

**MEMORANDUM OPINION**

Metropolitan Police Department (MPD) officers stopped Defendant Carlos Price, arrested him, and later recovered a gun from his person.[1] He is charged with unlawfully possessing that gun and its ammunition in violation of 18 U.S.C. § 922(g)(1) and 22 D.C. Code § 4503(a)(1). Mr. Price moves to suppress this evidence, arguing that officers unconstitutionally seized him and that the gun must therefore be excluded under the exclusionary rule. The Government opposes.

This is a close case. But after careful consideration of the record and the Parties' arguments, the Court reaches two conclusions that compel it to rule for Mr. Price. First, the Court finds that Mr. Price was unlawfully seized. Second, the Court concludes that no intervening circumstances broke the causal chain between Mr. Price's unconstitutional seizure and the recovery of the gun that would make the exclusionary rule inapplicable here. Accordingly, the Court **GRANTS** Mr. Price's Motion to Suppress Physical Evidence, ECF 14, and **ORDERS** that the gun and its ammunition be suppressed.

---

[1] Unless otherwise indicated, the formatting of quoted materials has been modified throughout this opinion, for example, by omitting internal quotation marks and citations, and by incorporating emphases, changes to capitalization, and other bracketed alterations therein. All pincites to documents filed on the docket are to the automatically generated ECF Page ID number that appears at the top of each page.

1

I.  **BACKGROUND**

The following facts are taken from the record, including the exhibits to the Parties' briefs and video footage and testimony admitted at the evidentiary hearing on Mr. Price's Motion.

On December 29, 2021, at about 9:21 PM, three marked police cruisers turned onto the 1300 block of Childress Place NE in Washington, D.C. June 21, 2022, Hr'g on Mot. to Suppress, Gov't Ex. 1 (Bodycam Footage from Officer Amengual) [hereinafter Gov't Ex. 1], 21:21:31. Metropolitan Police Department (MPD) Crime Suppression Team (CST) Officer Roberto Amengual, who later testified at the evidentiary hearing, drove the first cruiser. CST Officers Matthew Konkol, Zurab Salavatov, and Joseph Blasting were passengers in Officer Amengual's cruiser. Tr. of June 21, 2022, Hr'g on Mot. to Suppress, ECF 22 [hereinafter June 21, 2022, Hr'g Tr.] at 10–11. Although on patrol, Officer Amengual was driving the police cruiser at a speed typical for a car on a side street, not very slowly. *See id.* at 34.

The trio of cruisers passed several cars parked along Childress Place before Officer Amengual pointed to a parked Toyota Scion that had several people sitting inside it. Gov't Ex. 1 at 21:21:31–43. The Scion had its engine running, its windows up, and its sunroof cracked open. *Id.* at 22:01:00; June 21, 2022, Hr'g Tr. at 12–13. Officer Amengual pulled his cruiser over and the others followed suit. Gov't Ex. 1 at 21:21:42–21:22:05. All three cruisers parked alongside the Scion—one cruiser stopped slightly in front of the Scion, another stopped near the rear of the Scion, and the third parked directly behind the middle cruiser. *Id.* at 21:32:09. The officers positioned their cruisers in a way that would prevent the Scion's driver from leaving the parking space by sandwiching the Scion between the cruisers and the sidewalk. *Id.*

After boxing the Scion into its parking space, Officer Amengual and the other officers riding with him got out of the cruiser. *Id.* at 21:21:40–21:22:00. The officers were armed and in uniform. *Id.* at 21:22:01–17. Their body-worn cameras ("bodycams") were on and recorded their

2

interactions with the Scion's occupants. *See generally* Gov't Ex. 1; June 21, 2022, Hr'g on Mot. to Suppress, Gov't Ex. 2 (Bodycam Footage from Officer Konkol) [hereinafter Gov't Ex. 2].

There were four people in the Scion: a girl in the driver's seat, a girl in the front passenger seat, another girl in the back seat on the driver's side, and Mr. Price in the back seat on the passenger's side. Gov't Ex. 1 at 21:22:10–18. The four officers approached the Scion with their flashlights on. *Id.* at 21:21:57–21:22:15. Two officers approached the passenger's side of the Scion and beamed their illuminated flashlights into the front and rear passenger windows. *Id.* A third officer shined his flashlight into the window of the backseat passenger on the driver's side of the car. *Id.* Officer Amengual approached the driver's window and pointed his flashlight at the driver. *Id.*

The Government has offered two reasons why the officers made contact with the Scion's passengers. First, the Government contends that officers ran the Scion's (temporary, Virginia) license plate and determined that the tags did not come back to a registered vehicle, indicating a potential code violation. ECF 15 at 1–2; June 21, 2022, Hr'g Tr. at 12. Second, the Government insists that the officers saw a "plume" of white smoke coming from the cracked sunroof that they thought was marijuana smoke. ECF 15 at 2; ECF 23 at 6–7; *see* ECF 1 at 2. Mr. Price disputes both claims, arguing that the bodycam footage does not support these purported justifications. *See* Tr. of July 12, 2022, Oral Arg. on Mot. to Suppress [hereinafter July 12, 2022, Hr'g Tr.] at 29. But no one disputes that when the officers shined their flashlights at the occupants and the driver rolled down the window in response, there was a faint haze visible in the car. Gov't Ex. 1 at 21:22:05–15; Gov't Ex. 2 at 21:22:09. At that point, the officers smelled marijuana, June 21, 2022, Hr'g Tr. at 40; Gov't Ex. 1 at 21:21:59–21:22:15.

Officer Amengual asked the passengers if they were over twenty-one, which is the legal age to possess marijuana in the District of Columbia. D.C. Code § 48-904.01(a)(1); Gov't Ex. 1 at 21:22:14–20. Officer Amengual then asked the passengers for their identification cards, instructed them to step out of the car, and continued to question them about their ages. Gov't Ex. 1 at 21:22:14–58, 21:24:54–21:31:07. Mr. Price complied with the officer's directive to get out of the car and stood on the sidewalk near the back of the Scion. He was flanked by two police officers. Gov't Ex. 2 at 21:24:03–21:25:43. After all the passengers were out of the car, Officer Amengual shined his flashlight into the car, illuminating a "twist" bag of marijuana on the backseat. Gov't Ex. 1 at 21:24:01–09.

Within minutes of boxing in the Scion, Mr. Price told an officer his birth date, establishing that he was over 21, and an officer acknowledged that he believed Mr. Price. *See* Gov't Ex. 2 at 21:24:30–21:25:55. But the officers did not release him from the scene. When Mr. Price offered to retrieve his identification card from his house, Officer Konkol to him to "relax." Gov't Ex. 2 at 21:24:55–21:25:00. Officer Salavatov continued to talk to Mr. Price and the other passengers about the marijuana, and told them that Mr. Price was the only person who could legally possess it. June 21, 2022, Hr'g on Mot. to Suppress, Def. Ex. 4 (Bodycam Footage from Officer Salavatov) [hereinafter Def. Ex. 4] at 21:31:45–56.

While Officer Salavatov engaged the passengers, Officer Amengual continued to search the Scion. Gov't Ex. 1 at 21:31:20–55. He shined his flashlight into the front passenger area and tousled a winter coat that was on the floor. *Id.* at 21:31:36–55. He grasped at one of the coat's pockets and felt an object that he believed to be a gun. *Id.* at 21:31:48–53; June 21, 2022, Hr'g Tr. at 22. Officer Salavatov was still talking to Mr. Price and the other passengers when Officer Amengual found the coat, so it is not clear whether Mr. Price noticed anything that happened

4

during the search. Gov't Ex. 2 at 21:31:45–53; June 21, 2022, Hr'g on Mot. to Suppress, Def. Ex. 1 (Bodycam Footage from Officer Amengual) [hereinafter Def. Ex. 1] at 21:31:45–53. Officer Amengual gestured toward Officer Salavatov to come over to him and then told him, quietly, "we've got a 1-800," which is a police code for a firearm. Gov't Ex. 1 at 21:31:58–21:32:00; Def. Ex. 1 at 21:31:58–21:32:00. The Government argues that Mr. Price overheard this exchange between Officers Amengual and Salavatov, ECF 16 at 3, but Mr. Price disputes that, contending that Officer Amengual's police code reference is barely audible in the bodycam footage, ECF 20 at 13.

At 9:32 PM, after Officer Amengual made the 1-800 comment, Mr. Price raised his cell phone. Gov't Ex. 2 at 21:32:21–35. He told Officer Konkol that he wanted to record the scene. *Id.* Officer Konkol again instructed Mr. Price to relax as Mr. Price filmed the officers, and they went back and forth about it a bit. *Id.* Standing alongside Officer Amengual nearest the car's passenger-side door, Officer Salavatov moved the coat to the top of the Scion's roof. Def. Ex. 1 at 21:32:34–39.

At this point, Mr. Price took off running toward his house, about two doors down from the Scion. Gov't Ex. 2 at 21:32:36; June 21, 2022, Hr'g Tr. at 25. Officers Konkol, Blasting, Salavatov, and officers from the other cruisers chased him. Gov't Ex. 2 at 21:32:35–52. The officers attempted to apprehend Mr. Price at the front threshold of his house. One officer told another to "break his arm, break his arm." June 21, 2022, Hr'g on Mot. to Suppress, Def. Ex. 2 (Bodycam Footage from Officer Blasting) [hereinafter Def. Ex. 2] at 21:32:55–58. Mr. Price shouted, "Don't f---ing touch me" and tried to flee from the officers to get inside his home. Gov't Ex. 2 at 21:32:46–21:33:00. The officers grabbed Mr. Price's shirt and arm as someone inside the house opened the door. *Id.* at 21:32:55; Def. Ex. 2 at 21:32:55–57. Mr. Price fell to the ground, but kept trying to get inside

5

of the house as two officers grabbed his lower legs to prevent him from doing so. Gov't Ex. 2 at 21:32:45–21:33:10. The officers told Mr. Price to "stop resisting" and tried to pull him, feet first, out of the doorway. *Id.* Several people inside the home stood at the doorway near Mr. Price's head. *Id.* at 21:33:00–15.

Mr. Price reached into the front of his pants with one hand, and an officer shouted, "He's got a gun!" *Id.* at 21:33:16–18. But, when Mr. Price removed his hand from his pants almost immediately after, he was not holding anything. *Id.* at 21:33:50–56. Mr. Price insisted that he did not have a gun and that he was not resisting, and there was no further discussion about Mr. Price being potentially armed at the scene. *Id.* at 21:33:24–26. Eventually, officers successfully dragged Mr. Price out of his house by his legs and cuffed his hands behind his back. *Id.* at 21:33:40–21:34:50.

Officer Amengual stayed near the Scion while Mr. Price was fleeing and being apprehended. Gov't Ex. 1 at 21:32:30–21:35:00. He reached inside the coat that had been removed from the Scion's front passenger area, which was not where Mr. Price had been seated, and retrieved a gun. Gov't Ex. 1 at 21:35:01–24. These events—from the time that the cruisers first pulled alongside the Scion to when Mr. Price was apprehended—occurred over about thirteen minutes. Gov't Ex. 2 at 21:21:38–21:34:50.

After apprehending Mr. Price, officers put him in the back of one of the police cruisers to take him to a police station. Gov't Ex. 2 at 21:35:45–21:36:00. No officer searched Mr. Price at the scene before transporting him. June 21, 2022, Hr'g Tr. at 28. It was not until Mr. Price was at the station, at about 10:07 PM, that an officer searched Mr. Price and found a gun in his pants. June 21, 2022, Hr'g on Mot. to Suppress, Gov't Ex. 3 (Bodycam Footage from Officer Love)

6

[hereinafter Gov't Ex. 3] at 22:07:37; June 21, 2022, Hr'g Tr. at 28–30; June 21, 2022, Hr'g on Mot. to Suppress, Gov't Ex. 4.

## II.   LEGAL STANDARD

The Fourth Amendment to the U.S. Constitution protects individuals "against unreasonable searches and seizures." To realize the core guarantee of the Fourth Amendment and "deter future unlawful police conduct," the products of an illegal search or seizure must be suppressed under the exclusionary rule. *United States v. Calandra*, 414 U.S. 338, 347 (1974). This rule is not meant to "redress" an individual's constitutional injury, *id.*, but rather to "compel[] respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard" the Fourth Amendment's protections, *United States v. Weaver*, 808 F.3d 26, 33 (D.C. Cir. 2015) (quoting *Elkins v. United States*, 364 U.S. 206, 217 (1960)).

Not every encounter between a police officer and a private person constitutes a seizure within the meaning of the Fourth Amendment. A Fourth Amendment seizure occurs only "when physical force is used to restrain movement or when a person submits to an officer's 'show of authority.'" *United States v. Brodie*, 742 F.3d 1058, 1061 (D.C. Cir. 2014) (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)). Officers make such a "show of authority" when, under the totality of the circumstances, a "reasonable person" would not believe that they are "free to leave" the encounter. *United States v. Castle*, 825 F.3d 625, 632 (D.C. Cir. 2016) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). Stops are a form of Fourth Amendment seizure. *See Terry v. Ohio*, 392 U.S. 1, 16 (1968). To effect a lawful stop, an officer must have reasonable and articulable suspicion, based on objective facts, that a person was engaging in criminal activity. *See id.* at 21–22; *Brown v. Texas*, 443 U.S. 47, 51 (1979).

Mr. Price bears the burden of establishing that he was seized, *see Castle*, 825 F.3d at 633, but it is the Government's burden to produce enough evidence to support reasonable suspicion

7

justifying the stop, *id.* at 634. The Court must evaluate the totality of the circumstances of the encounter, consider only the facts available to the officers at the time of the seizure, and assess those facts using an "objective framework." *Id.* at 635.

### III.   ANALYSIS

Mr. Price argues that the officers had no valid reason to stop him and thus the gun is the fruit of an illegal seizure that must be suppressed. ECF 14 at 4–5. The Government maintains that the officers lawfully seized Mr. Price. ECF 15 at 5–14. In the alternative, the Government argues that Mr. Price's flight from the scene and subsequent assault on Officer Blasting are intervening circumstances that purged the taint of any illegal stop, thus allowing it to make use of the recovered evidence. ECF 25 at 1–3. The Court agrees with Mr. Price.

**A. MPD Officers Unlawfully Seized Mr. Price**

First, the Court finds that the officers unlawfully seized Mr. Price by stopping him without reasonable and articulable suspicion of criminal conduct. Mr. Price has met his burden of establishing that he was seized, but the Government has not satisfied the Court that the officers had a good reason to do so.

*1. Mr. Price has met his burden of establishing that he was seized.*

The Government concedes that the officers stopped Mr. Price when they parked three police cruisers alongside the Scion "effectively blocking [it] in." ECF 23 at 2. The Government's stance is compelled by *United States v. Delaney*, in which the D.C. Circuit concluded that a seizure occurred where officers parked a cruiser a few feet from the defendant's car at night, positioned the cruiser in such a way that the driver could not easily maneuver around it, and aimed the cruiser's take-down light at the car. 955 F.3d 1077, 1082–83 (D.C. Cir. 2020). The D.C. Circuit determined that the officers' conduct would communicate to a reasonable person on the receiving end of it that they were not free to leave. *Id.* at 1083. This case involves a similar factual scenario.

8

Indeed, this case may be easier: there were more police cars involved here than in *Delaney*, the officers completely blocked the Scion into its parking space at night, and multiple officers almost immediately surrounded the car with their flashlights trained on the passengers. Gov't Ex. 1 at 21:21:55–21:22:10. And Mr. Price submitted to the officers' show of authority by complying with their directives. Gov't Ex. 2, 21:21:55–21:24:37; *see Brodie*, 742 F.3d at 1061. Accordingly, on this record, and particularly given the Parties' agreement on the issue, the Court concludes that Mr. Price was seized when the officers surrounded the Scion with their cruisers.

> 2. *The Government has not met its burden of establishing that officers had reasonable and articulable suspicion of criminal activity.*

The Court now must determine whether the Government has met its burden of showing that the officers had reasonable and articulable suspicion that the Scion's passengers were engaging in criminal activity at the time of the stop. The Government has argued two bases for the stop at various points during this litigation—the Scion's unregistered tags and the suspected marijuana smoke that officers purportedly saw coming out of the sunroof before they pulled over. ECF 15 at 1–2. After a close review of the officers' bodycam footage and the testimony elicited at the evidentiary hearing on Mr. Price's Motion, the Court finds that the record does not support the Government's position.

> (a) The Registration Check

Officer Amengual testified on direct examination that the officers stopped the Scion in part because its temporary tags were not associated with a registered vehicle. June 21, 2022, Hr'g Tr. at 12. That testimony was consistent with the Government's representations about the bases for the stop in its first opposition motion. ECF 15 at 1–2; 6–7. But then the record gets messy on this point. On cross-examination, after being confronted with the bodycam footage, Officer Amengual acknowledged that Officer Blasting called in the Scion's license plates *after* the officers boxed in

the Scion, emerged from their cruisers, and approached the car with their flashlights on. June 21, 2022, Hr'g Tr. at 43–44. That testimony suggests that the officers did not make the call to find out whether the Scion's tags were associated with the vehicle until after they had already seized Mr. Price and the other passengers. Presumably because of this conflicting testimony, the Government has backtracked from the significance of the tags in justifying the stop. It now appears to acknowledge that the chronology of when the registration check occurred relative to the stop is not clear. July 12, 2022, Hr'g Tr. at 7.

These inconsistences would be enough for the Court to dismiss the alleged unregistered tags as a basis for the stop, but there is sufficient evidence in the record that leads the Court to find that the tags were, in fact, run after officers seized Mr. Price, not before. The Court can hear Officer Blasting calling in the tags when he is already out of the police cruiser, after officers seized Mr. Price. Def. Ex. 2 at 21:21:57–21:22:00. The video shows that Officer Amengual pointed at the Scion at 9:21 PM, immediately prompting all three cruisers to pull over and four officers to leave Officer Amengual's cruiser to surround the Scion. Gov't Ex. 1 at 21:21:41–21:22:04; Gov't Ex. 2 at 21:21:41–21:22:04; Def. Ex. 1 at 21:21:41–21:22:04; Def. Ex. 2 at 21:21:41–21:22:04. Those actions occurred within seconds of each other. Even considering that there is no sound on the video until the officers are out of the cruiser, the Court sees no indication that any search of the Scion's tags could have occurred during this brief period. Nor does the Court believe that Officer Blasting would have had a reason to call in the tags when he was outside of his cruiser if the check had already been done before the officers pulled over. Since the Court finds that an officer did not run the tags until after Mr. Price was seized, the result of the plate check does not supply a basis for the stop.

(b) The Plume of White Smoke

The Government also contends that officers seized the Scion's passengers because they saw a "plume of white smoke" coming from the sunroof. ECF 15 at 2; ECF 23 at 3; *see also* June 21, 2022, Hr'g Tr. at 13. Officer Amengual testified that the "time of day" coupled with his experience stopping people who were illegally smoking marijuana in cars led him to believe that the white smoke was marijuana. June 21, 2022, Hr'g Tr. at 13.

The Court does not have to rely exclusively on any testimony or the Parties' representations to make its factual findings because there is bodycam footage depicting the relevant events. The Court has meticulously reviewed that footage. The videos do not show any white smoke coming from the sunroof at all—not before the officers pulled over and not even when officers were standing next to the Scion, which was brightly illuminated by streetlights and the officers' flashlights. Gov't Ex. 1 at 21:21:51–21:22:09; Gov't Ex. 2 at 21:21:51–21:22:09; Def. Ex. 1 at 21:21:51–21:22:09; Def. Ex. 4 at 21:21:51–21:22:09.

The Government—and Officer Amengual for that matter—acknowledges that the videos do not show the "plume" of white smoke that officers claim they saw while driving by. ECF 23 at 6–7; June 21, 2022, Hr'g Tr. at 37. Although the Government attempts to explain this fact away, the Court is ultimately unpersuaded by the Government's various rationales.

First, the Government asserts that the footage does not show the white smoke because body-worn cameras are affixed to the officers' chests—about two feet away from the officers' eyes—and because various visual impediments make the white smoke difficult to see on video. June 21, 2022, Hr'g Tr. at 57–58; July 12, 2022, Hr'g Tr. at 13–14. The Government's point that bodycam footage may not capture everything that the officers can observe with their own eyes is well taken. But fogginess, in the form of mist and, most noticeably, car exhaust from the Scion

11

and police cruisers, is clearly visible on the bodycam footage. *See, e.g.*, Gov't Ex. 2 at 21:22:00, 21:30:26. The Court doubts that the bodycams captured all sorts of outdoor haziness from a number of angles, but did not capture any of the white smoke allegedly billowing from the Scion.

Second, the Government points to clips of the bodycam footage showing that once the Scion's windows were rolled down, some haze was visible inside the car. ECF 23 at 4–5. The Court agrees that the footage shows a faint haze in the car after the windows were rolled down. The fact that haze can be seen in the Scion but not emanating from its windows once rolled down makes it unlikely to the Court that officers could actually see a plume of white smoke coming from the sunroof. Further, the interior of the Scion, though eventually illuminated by the officers' flashlights, was much darker than the Scion's exterior, which was lit the entire time by streetlights and flashlights. Thus, if the faint haze in the car could be seen even in relatively dim lighting, it is more likely that any plume of white smoke coming from the sunroof would have also been visible on the bodycam footage.

The Government also argues that, even if there was no smoke coming out of the sunroof at the time the officers approached the car, it does not "eliminate[] the possibility that seconds prior, [the officers] could have seen the smoke coming out of the vehicle." July 12, 2022, Hr'g Tr. at 11. The Court is not convinced. Mere seconds passed between Officer Amengual's pointing to the Scion, the cruisers' boxing in of the car, and the officers' surrounding of the vehicle. The Court finds it unlikely that the plume of smoke the officers described could have completely dissipated so quickly.

The Court cannot find that the Government has satisfied its burden on this point when the video footage does not support its argument. The officers may have smelled marijuana after they seized the Scion, and even observed a faint haze contained in the car, but the reasonableness of the

12

seizure turns on the facts available to the officers at the time of the stop, not on those discovered later. *See Castle*, 825 F.3d at 635; *Terry*, 392 U.S. at 21–22. Because the Court finds that there was no visible smoke coming from the sunroof before the officers seized the Scion, the Court cannot accept this justification as a basis for the stop.

For these reasons, the Court finds that the officers did not run the Scion's tags until after the stop and that there was no visible white smoke coming from the sunroof before the officers seized the Scion's passengers. That Mr. Price was sitting in a parked car with the engine running at night with other passengers is not sufficient to provide reasonable suspicion of any nefarious activity. Accordingly, the Court concludes that Mr. Price's seizure was unconstitutional.

### B. The Gun Recovered Pursuant to Mr. Price's Unlawful Seizure Must be Suppressed

The Government urges the Court to find that it can nonetheless use the gun as evidence because Mr. Price's flight from the scene and his "subsequent assault" of Officer Blasting broke the chain of causation between any illegal stop and the recovery of the evidence. ECF 23 at 9–10. The Court disagrees.

The exclusionary rule compels courts to suppress products of an unlawful search or seizure, *see Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963), but the rule has its limits. The Supreme Court has recognized at least three exceptions: the independent source doctrine, the inevitable discovery doctrine, and the attenuation doctrine. *Utah v. Strieff*, 579 U.S. 232, 238 (2016). Each exception is tailored to maintain the proper balance between the exclusionary rule's core purpose to deter unlawful police conduct and the "substantial social costs" that may be incurred when evidence is suppressed. *Id.* at 237. The third exception to the exclusionary rule—the attenuation doctrine—is relevant here.

The attenuation doctrine narrows the scope of the exclusionary rule by requiring admission of evidence when "the connection between the illegal seizure and the subsequent discovery of the challenged evidence has become so attenuated as to dissipate the taint" of the unlawful conduct. *United States v. Scios*, 590 F.2d 956, 960 (D.C. Cir. 1976). Under the doctrine, the Court must assess whether "the [unlawful] seizure is a but-for cause of the discovery of the evidence . . . and if the causal chain has not become too attenuated to justify exclusion." *Brodie*, 742 F.3d at 1062–63.

The Court determines whether the causal chain has become "too attenuated" by considering three factors the Supreme Court outlined in *Brown v. Illinois*: (1) the "temporal proximity" of the unconstitutional conduct and the discovery of the evidence; (2) "the presence of intervening circumstances"; and (3) "the purpose and flagrancy of the official misconduct." 422 U.S. 590, 603–04 (1975); *see also Brodie*, 742 F.3d at 1063. When the chain of causation remains intact, evidence is suppressed under the ordinary application of the exclusionary rule. The Court considers each *Brown* factor below, ultimately concluding that the scales tip in Mr. Price's favor.

1. Brown *factors one and three "cancel out."*

The Court analyzes the first and third *Brown* factors together because they "cancel out, at most" on the facts of this record. *Brodie*, 742 F.3d at 1063. The temporal proximity prong weighs in Mr. Price's favor because only about 46 minutes passed from the time officers seized Mr. Price to the time that an officer recovered a gun from him at the police station. Gov't Ex. 1 at 21:21:41; Gov't Ex. 3 at 22:07:37. The time gap would only have been about 13 minutes had officers searched Mr. Price right after they apprehended him, as was normal protocol. Gov't Ex. 1 at 21:21:41; Gov't Ex. 2 at 21:34:50. Under applicable precedent, this is not enough time to separate the officers' conduct from the recovery of the gun. *See Brown*, 422 U.S. at 604 (finding that "less than two hours" between an illegal arrest and a confession was insufficient to break the causal

14

chain). And with respect to the third prong, the Court does not find that the officers' conduct was particularly fragrant, but it was also not an innocent mistake. Accordingly, whether the gun must be suppressed turns on the second *Brown* factor—intervening circumstances. *See Brodie*, 742 F.3d at 1063.

2. Brown *factor two weighs in Mr. Price's favor.*

Analyzing these facts under the second *Brown* factor is more difficult. Both sides make good arguments. Mr. Price contends that his attempt to get away from officers and into his house were not intervening circumstances sufficient to break the chain of causation between the illegal stop and recovery of the gun. ECF 27 at 5. Mr. Price relies on the D.C. Circuit's decision in *United States v. Brodie*, 742 F.3d 1058 (D.C. Cir. 2014), to support his claim. In *Brodie*, the defendant was unlawfully stopped by police, fled from the officers, and discarded three guns as he ran. *Id.* at 1060. Officers also recovered drugs from the defendant after apprehending him. *Id.* The Court ruled that Brodie's flight and abandonment of evidence were not intervening circumstances that broke the chain of causation because the conduct "flowed directly from the seizure." *Id.* at 1063–64.

The Government argues that Mr. Price did not just run from the officers, but committed new crimes, unconnected to his seizure, by assaulting Officer Blasting and resisting arrest. ECF 25 at 1–3. The Government believes that these crimes broke any causal connection, supplied probable cause for Mr. Price's arrest, and provided a basis for officers to search him after that arrest. *See id.* at 1–4; ECF 15 at 14–15. It relies on out-of-jurisdiction cases that have found that a person's commission of a "new" and "independent, second offense" constitutes an intervening circumstance sufficient to break the causal chain, ECF 23 at 9; ECF 25 at 1–2, principally the Eleventh Circuit's decision in *United States v. Bailey*, 691 F.2d 1009 (11th Cir. 1982). In that case, the defendant ran from law enforcement agents who had seized him, then viciously assaulted one

15

of the agents by striking him in the head, punching him, and trying to reach for the agent's firearm. *Id.* at 1012–13. The Eleventh Circuit concluded that officers could arrest the defendant for these new, distinct crimes and thus make use of the evidence recovered pursuant to that arrest. *Id.* at 1019. Other courts have similarly recognized circumstances in which new crimes—like assaulting officers or fleeing in a manner that creates a risk to public safety—purge the taint of an unlawful seizure. *See, e.g.*, *United States v. Nooks*, 446 F.2d 1283, 1288 (5th Cir. 1971) (shooting at officers while fleeing creates a lawful basis to arrest and search a defendant); *United States v. Sprinkle*, 106 F.3d 613, 619 (4th Cir. 1997) (same); *United States v. Garcia*, 516 F.2d 318, 319–20 (9th Cir. 1975) (unlawful stop did not taint arrest and subsequent search where defendant fled in vehicle and led officers on high-speed chase, among other conduct).

Having carefully considered these arguments, the Court agrees with Mr. Price's position for several reasons.

First, the Court finds that Mr. Price did not assault Officer Blasting as the Government describes. Mr. Price undoubtedly ran from officers, attempted to evade capture, and tried to get into his house. And there was physical contact between Mr. Price and the officers as he tried to flee. But after carefully reviewing the video evidence, the Court cannot conclude that Mr. Price kicked, punched, or otherwise assaulted Officer Blasting or any other officer. *See* Def. Ex. 2 at 21:32:46–21:33:50. The Court finds that Mr. Price's second-by-second breakdown of his interaction with Officer Blasting set forth in his Brief comports with the video evidence and adopts his description of his conduct as part of the Court's factual findings. ECF 27 at 2.

Second, the Government appears to suggest that the D.C. Circuit has fully endorsed *Bailey*'s logic and reasoning, ECF 23 at 9, but this Court thinks that is an overstatement. In *Brodie*, the D.C. Circuit discussed *Bailey*, recognized similar lines of cases from other jurisdictions, and

distinguished it from the facts before it. *See Brodie*, 742 F.3d at 1063–64. But the Court also expressly declined "to get into the soundness" of the out-of-circuit decisions. *Id.* at 1063. This Court is reluctant to read much more into the opinion.

Further, the Court has some reservations about applying a "new and distinct crime" rule where the "new" crime involves, at most, resistance in the manner in which Mr. Price did. His efforts to get out of the officers' grasp and into his house appear to be so bound up with his flight from the unlawful stop that it is hard for the Court to find that his conduct at his front door did not "flow[] directly from [his] seizure." *Id.* at 1063–64. The Court certainly recognizes the strong policy justifications for allowing police to arrest suspects for new and independent crimes following an unconstitutional police encounter, which *Bailey* and other courts aptly describe. *See, e.g., Bailey*, 691 F.2d at 1017–18. It makes sense that even unlawful police conduct should not provide a suspect a free pass to commit new, distinct, and (as described in some of the cases) potentially more egregious crimes by avoiding arrest for them. But where the purported "new" crime involves unexceptional flight or resisting arrest, the policy concerns tilt toward exclusion: the deterrence justifications for the exclusionary rule would be undermined if officers could use generic crimes like "resisting arrest" to smuggle otherwise inadmissible evidence into court. *See Jones v. State*, 745 A.2d 856, 873 (Del. 1999) (explaining that such an outcome would be "reached by bootstrap analysis").

Ultimately, the Court finds it unnecessary to try to reconcile these concerns, because the facts of *Bailey*, and the other cases upon which the Government relies, are so different from what happened here that they are inapplicable. Mr. Price did not shoot at officers, punch them, strike them in the head, or endanger the public by fleeing in a car at a high speed. *See, e.g., Bailey*, 691 F.2d at 1012; *Nooks*, 446 F.2d at 1288; *Sprinkle*, 106 F.3d at 619. Here, Mr. Price ran to his house

on foot—a stone's throw away from where the police stopped him—and tried to get away from the officers and through his front door. To the extent that he reached in his pants because he was trying to "discard a gun" as the Government suggests, ECF 15 at 15, his conduct was not all that different from Brodie's. *See Brodie*, 742 F.3d at 1060. Any distinction between the two cases is not so great as to eclipse the reason for Mr. Price's flight and resistance in the first place: an unlawful police stop.

Accordingly, the Court finds that Mr. Price's flight from police and continued efforts to evade apprehension flowed directly from his seizure and did not break the causal chain.

## IV.     CONCLUSION

For the reasons detailed above, the Court **GRANTS** Mr. Price's Motion to Suppress Physical Evidence, ECF 14, and **ORDERS** that the gun and ammunition be suppressed.

**SO ORDERED.**


DATE: November 3, 2022


                                                                                         _____
                                                                                         Hon. Jia M. Cobb
                                                                                         U.S. District Court Judge